**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE COLLEGE ATHLETE ELIGIBILITY RULES ANTITRUST LITIGATION** | **MDL No. _____** |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR TRANSFER OF ACTIONS TO THE MIDDLE DISTRICT OF TENNESSEE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED PRETRIAL PROCEEDINGS**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. *Pavia v. NCAA* (consolidated with *Bellamy v. NCAA,* 3:20-cv-00750), No. 3:24-cv-01336 (M.D. Tenn., Campbell, J.) ..... 3

B. *Zeigler v. NCAA*, No. 3:25-cv-226 (E.D. Tenn., Crytzer, J.) ..... 4

C. *Boyd v. NCAA*, No. 3:25-cv-00729 (M.D. Tenn., Campbell, J.) ..... 5

D. *Patterson v. NCAA*, No. 3:25-cv-00994 (M.D. Tenn., Campbell, J.) ..... 5

E. *Morton v. NCAA*, No 1:26-cv-01538 (N.D. Ga., Geraghty, J.) ..... 7

F. *Wisne v. NCAA*, No. 1:26-cv-03063 (D. Colo., Sweeney, J.) ..... 8

G. *Fuller v. NCAA*, No. 2:26-cv-01974 (D. Nev., Gordon, J.) ..... 8

H. *Wiley v. NCAA*, No. 2:26-cv-02281 (D. Nev., Silva, J.) ..... 9

III. LEGAL STANDARD ..... 9

IV. ARGUMENT ..... 10

A. Transfer of the College Athlete Eligibility Cases for Coordination Is Appropriate Under 28 U.S.C. § 1407 ..... 10

1. These Actions Involve Numerous Common Questions of Fact ..... 10

2. The Geographic Dispersal of Existing Cases and the High Likelihood of Additional Tag-Along Actions Weighs In Favor of Centralization ..... 12

3. Centralization Will Eliminate Duplicative Discovery. ..... 12

4. Centralization Will Avoid Inconsistent Pretrial Rulings, Including With Respect to Overlapping Putative Classes ..... 14

5. Centralization Will Conserve Party, Counsel, and Judicial Resources. ..... 16

6. The Differing Procedural Postures of the Cases Supports, Rather Than Undermines, the Case for Centralization. ..... 17

7. Transfer Pursuant to 28 U.S.C. § 1404 Is Not Adequate. ..... 18

B. The Middle District of Tennessee Is the Proper District for Centralization ..... 19

V. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Cases**

*Boyd v. NCAA*,
No. 3:25-cv-0079, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025)................................ 5

*In re Air Crash Into Java Sea on Jan. 9, 2021*, 669 F. Supp. 3d 1368 (J.P.M.L. 2023)................................ 18

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*,
357 F. Supp. 3d 1391 (J.P.M.L. 2018)................................ 12

*In re Cap. One Bank Credit Card Int. Rate Hike Litig.*,
716 F. Supp. 2d 1372 (J.P.M.L. 2010)................................ 18

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*,
619 F. Supp. 3d 1349 (J.PM.L. 2022)................................ 18

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
655 F. Supp. 3d 1380 (J.P.M.L. 2023)................................ 12, 18

*In re Diisocyanates Antitrust Litig.*,
341 F. Supp. 3d 1376 (J.P.M.L. 2018)................................ 13

*In re Enfamil Lipil Mktg. & Sales Pracs. Litig.*,
764 F. Supp. 2d 1356 (J.P.M.L. 2011)................................ 17

*In re First Nat'l Bank, Heavener, Okla. (First Mortg. Revenue Bonds) Secs. Litig.*,
451 F. Supp. 995 (J.P.M.L. 1978)................................ 14, 15

*In re Ford Fusion & C-Max Fuel Econ. Litig.*,
949 F. Supp. 2d 1368 (J.P.M.L. 2013)................................ 13

*In re Future Motion, Inc. Prods. Liab. Litig.*,
709 F.Supp.3d 1394 (J.P.M.L. 2023)................................ 17

*In re Hair Relaxer Mktg., Sales Pracs., & Prods. Liab. Litig.*,
655 F. Supp. 3d 1374 (J.P.M.L. 2023)................................ 13

*In re Holiday Magic Secs. & Antitrust Litig.*,
375 F. Supp. 1400 (J.P.M.L. 1974)................................ 14

*In re Hyundai & Kia Fuel Economy Litig.*,
923 F. Supp. 2d 1364 (J.P.M.L. 2013)................................ 13

*In re Johnson & Johnson Talcum Powder Mktg., Sales Practices, & Prods. Liab. Litig.*,
220 F. Supp. 3d 1356 (J.P.M.L. 2016) ........ 12

*In re Juul Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
396 F. Supp. 3d 1366 (J.P.M.L. 2019) ........ 11, 12

*In re LTV Corp. Secs. Litig.*,
470 F. Supp. 859 (J.P.M.L. 1979) ........ 18

*In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litig.*,
24 F. Supp. 3d 1366 (J.P.M.L. 2014) ........ passim

*In re Nat'l Airlines, Inc. Maternity Leave Pracs. & Flight Attendant Weight Program Litig.*,
399 F. Supp. 1405 (J.P.M.L. 1975) ........ 14

*In re Nat'l Arb. Forum Antitrust Litig.*,
682 F. Supp. 2d 1343 (J.P.M.L. 2010) ........ 19

*In re Plumbing Fixture Cases*,
298 F. Supp. 484 (J.P.M.L. 1968) ........ 9

*In re Plumbing Fixtures*,
308 F. Supp. 242 (J.P.M.L. 1970) ........ 14

*In re Plumbing Fixtures*,
308 F. Supp. ........ 15

*In re Pork Direct & Indirect Purchaser Antitrust Litig.*,
544 F. Supp. 3d 1379 (J.P.M.L. 2021) ........ 15

*In re Republic Nat'l-Realty Equities Secs. Litig.*,
382 F. Supp. 1403 (J.P.M.L. 1974) ........ 14, 15

*In re Roundup Prods. Liab. Litig.*,
214 F. Supp. 3d 1346 (J.P.M.L. 2016) ........ 15

*In re Royal Alliance Assoc., Inc., Secs. Litig.*,
856 F. Supp. 2d 1339 (J.P.M.L. 2012) ........ 16

*In re S. Central States Bakery Prods. Antitrust Litig.*,
433 F. Supp. 1127 (J.P.M.L. 1977) ........ 17

*In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*,
412 F. Supp. 3d 1344 (J.P.M.L. 2019) ........ 13

*In re Sugar Indus. Antitrust Litig.*,
395 F. Supp. 1271 (J.P.M.L. 1975) ........ 14

*In re Taasera Licensing, LLC, Patent Litig.*,
619 F. Supp. 3d 1352 (J.P.M.L. 2022)........................................................... 16, 19

*In re Tremont Grp. Holdings, Inc., Secs. Litig.*,
626 F. Supp. 2d 1338 (J.P.M.L. 2009).................................................................. 14

*In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*,
363 F. Supp. 3d 1378 (J.P.M.L. 2019).................................................................. 11

*In re: Aon Corp. Wage & Hour Emp. Pracs. Litig.*,
581 F. Supp. 2d 1376 (J.P.M.L. 2008).................................................................. 16

*In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
24 F. Supp. 3d 1361 (J.P.M.L. 2014).................................................................... 13

*In re: Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, Prod. Liab. Litig.*,
704 F. Supp. 2d 1379 (J.P.M.L. 2010).................................................................. 11

*Patterson v. NCAA*,
No. 3:25-cv-00994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026) .................................. 6

*Pavia v. NCAA*,
154 F.4th 407 (6th Cir. 2025) ........................................................................... 3, 6

*Pavia v. NCAA*,
760 F. Supp. 3d 527 (M.D. Tenn. 2024).................................................................. 3

*Zeigler v. NCAA*,
No. 3:25-CV-226, 2025 WL 1671952 (E.D. Tenn. June 12, 2025) .............................. 4, 5

**Statutes**

28 U.S.C. § 1404........................................................................................... 18, 19

28 U.S.C. § 1407.......................................................................................... passim

28 U.S.C. § 1407(a) ............................................................................................ 9

## I. INTRODUCTION

Over the past year and a half, dozens of federal antitrust lawsuits have been filed by current and former student-athletes challenging eligibility rules promulgated by the member institutions of the National Collegiate Athletic Association ("NCAA"). Some of these lawsuits challenged the rules in place through the 2025–26 academic year, known collectively as the "Five-Year Rule," which generally allowed student-athletes to participate in four seasons of intercollegiate athletic competition over a consecutive five-year period starting upon collegiate enrollment. In June 2026, the NCAA's membership changed its eligibility rules to provide student-athletes the opportunity to compete in up to five seasons of intercollegiate athletics within an age-based window commencing at the earlier of collegiate enrollment or the academic year following a student-athlete's 19th birthday (known as the "Age-Based Eligibility Rule"). That rule change has prompted further litigation, involving several new federal antitrust lawsuits in just the last month.

Today, there are eight cases pending in various federal courts challenging the small set of NCAA eligibility rules governing the number of seasons of competition permitted for student-athletes. There are two putative federal antitrust class actions—*Patterson v. NCAA* (M.D. Tenn.) and *Wisne v. NCAA* (D. Colo.)—challenging the NCAA's decision to permit student-athletes four, rather than five, seasons of competition prior to the 2026–27 season.[1] There is one individual federal antitrust action raising the same claim—*Zeigler v. NCAA* (E.D. Tenn.). There are four other federal antitrust lawsuits—*Pavia v. NCAA* (M.D. Tenn), *Boyd v. NCAA* (M.D. Tenn.), and *Morton v. NCAA* (N.D. Ga.)—challenging the former Five-Year Rule on the grounds that the NCAA should not count seasons of competition in junior colleges or schools in the National Association

[1] A third overlapping putative class action is on file in the Northern District of Illinois, *Campbell v. NCAA* (No. 1:26-cv-07467), but the plaintiff has informed the NCAA's counsel that he intends to dismiss the complaint without prejudice before the NCAA's responsive pleading deadline of September 14.

of Intercollegiate Athletics ("NAIA"), a competing intercollegiate athletic association. And within the last month, two more lawsuits were filed in the District of Nevada—*Fuller v. NCAA* and *Wiley v. NCAA*—raising similar questions.

These cases arise out of a common nucleus of operative facts and contain substantially similar factual allegations and legal claims. Every plaintiff challenges the same small set of NCAA eligibility rules under the antitrust laws. And every plaintiff seeks the same relief: an additional season of competition, or damages for lost opportunities to participate. The NCAA—the common defendant in all these cases—accordingly believes that coordination of these cases before Chief Judge Campbell in the Middle District of Tennessee is appropriate under 28 U.S.C. § 1407, because it will enable the coordination of multiple overlapping cases in front of the judge with the most experience addressing the issues presented. Coordination is often ordered where overlapping putative class actions in different districts assert substantially the same claims against the same defendants. That is the case here (as to *Patterson* and *Wisne*), but that is also not the full story. The other individual actions in different courts across the country—with more expected to come—further confirm the case for coordination, as the Panel has repeatedly realized in the past.

Bringing these cases together will promote the just, fair, and efficient conduct of these actions by allowing common development of their similar factual and legal claims. The cases all involve the same rules. And the legal issues are similar across the cases, such as the claimed markets, the claimed anticompetitive effects, the NCAA's procompetitive justifications, whether substantially less restrictive alternatives to the challenged rules exist, and the claimed injuries and remedies sought. While the cases are not all in precisely the same procedural posture, they remain ripe for coordination. Several of the cases have not yet commenced discovery, the ones that have are still in an early stage, and none of the cases have proceeded to deposition practice or expert

discovery. Pretrial coordination would thus provide significant benefits.

Coordination will serve the convenience of the parties and witnesses by avoiding duplicative discovery and inconsistent rulings. The majority of named plaintiffs filed in the Middle District of Tennessee, and Chief Judge Campbell has presided over the leading eligibility cases since *Pavia* in 2024, including *Boyd* and *Patterson*. He is therefore well positioned to oversee these matters.

The NCAA thus respectfully requests that the Court centralize *Boyd*, *Fuller*, *Morton*, *Patterson*, *Pavia*, *Wisne*, *Wiley*, and *Zeigler* under 28 U.S.C. § 1407 and establish an MDL for the future related cases that continue to be filed throughout the country.

## II. BACKGROUND

Through this motion, the NCAA seeks to coordinate a series of cases challenging the same basic set of eligibility rules. The cases, organized chronologically, are as follows:

### A. *Pavia v. NCAA* (consolidated with *Bellamy v. NCAA,* 3:20-cv-00750), No. 3:24-cv-01336 (M.D. Tenn., Campbell, J.)

*Pavia* started out as an individual antitrust lawsuit brought by a single student-athlete, Diego Pavia, in late 2024. He challenged the NCAA's Five-Year Rule claiming that seasons of competition in junior college should not count toward the four-seasons-of-competition limit. Chief Judge Campbell granted a preliminary injunction as to Pavia only on December 18, 2024. *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024). The NCAA appealed the case to the Sixth Circuit, but the appeal was dismissed as moot after oral argument, which took place after Pavia completed the season of competition he had sought. *Pavia v. NCAA*, 154 F.4th 407 (6th Cir. 2025). Two judges of the Sixth Circuit wrote separately to raise questions about the merits of Pavia's antitrust claim and to urge judges to "tread carefully in this area and insist on a thorough record from which to rule." *Id.* at 418 (Thapar, J., concurring); *id.* at 422 (Hermandorfer, J., concurring).

Upon remand, Judge Campbell consolidated *Pavia* with *Bellamy v. NCAA*, another antitrust case pending before him involving similar claims but where he had denied preliminary injunctive relief.

Plaintiffs' counsel then filed an amended complaint adding 26 new plaintiffs. *See* Dkt. No. 74, No. 3:24-cv-01336 (M.D. Tenn. Jan. 6, 2026). The plaintiffs sought permanent injunctive relief barring the NCAA from counting seasons in junior college towards the seasons of competition limit under the Five-Year Rule. *Id.* at 46. Plaintiffs also sought damages "for their loss of revenue sharing, loss of NIL compensation, loss of lifetime earning potential, and other damages arising from Defendant's violation of the Sherman Act" to the extent they "do not receive preliminary injunctive relief allowing them to play NCAA Division 1 football in 2026–27." *Id.* Several of the plaintiffs subsequently moved for preliminary injunctive relief permitting them to play football in the upcoming 2026–27 season. Judge Campbell conducted an evidentiary hearing on that motion but has not yet ruled on it. The case is set for trial in February 2027 and has been consolidated for discovery with *Boyd* and *Patterson*. No documents have been produced and no depositions have been taken.

**B. *Zeigler v. NCAA*, No. 3:25-cv-226 (E.D. Tenn., Crytzer, J.)**

Zakai Zeigler filed an individual antitrust action seeking injunctive relief and damages based on the Five-Year Rule. Zeigler enrolled at the University of Tennessee in 2021 and played four consecutive seasons of NCAA basketball, exhausting his eligibility. *Zeigler v. NCAA*, No. 3:25-CV-226, 2025 WL 1671952, at *1 (E.D. Tenn. June 12, 2025). He challenged the Five-Year Rule's limitation on seasons of competition under Section 1 of the Sherman Act and the Tennessee Trade Practices Act, arguing he should have been allowed to play for five seasons, not just four. Judge Crytzer denied a preliminary injunction, concluding that Zeigler could not show a likelihood of success on the merits of either of his claims, *id.* at 4; that Zeigler's asserted harms "are more monetary in nature," *id.* at 5, and that "an injunction would run the risk of harming (1) currently-

enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted," *id.*

Zeigler subsequently filed an amended complaint seeking damages for a lost fifth season. Dkt. No. 53. The NCAA's motion to dismiss is pending. No discovery has yet been taken; trial is currently set for February 23, 2027.

**C. *Boyd v. NCAA*, No. 3:25-cv-00729 (M.D. Tenn., Campbell, J.)**

Derrin Boyd filed an individual antitrust action seeking injunctive relief and damages based on a slightly different challenge to the Five-Year Rule. Boyd competed for several seasons at Georgetown College, an NAIA member institution, before enrolling at an NCAA member institution. *Boyd v. NCAA*, No. 3:25-cv-0079, 2025 WL 2432200, at *1 (M.D. Tenn. Aug. 22, 2025). After exhausting his four seasons of competition, Boyd sued the NCAA, claiming his years of competition in the NAIA should not count towards his NCAA eligibility clock. Judge Campbell denied Boyd's motion for preliminary injunction, finding that Boyd "has not shown he is likely to succeed on the merits of his antitrust challenge," *id.* at 8, and that the "balance of equities weighs against granting a preliminary injunction" because "[a]llowing Boyd another season of eligibility will almost certainly come at the expense of another eligible player," *id.* at 10.

After that decision, Boyd elected to pursue injunctive relief for a future season of competition and damages claim for the alleged lost opportunity to compete in the 2025–26 season. *See id.*, Dkt. No. 59. The case has been consolidated for discovery with *Pavia* and *Patterson*, with trial set for March 2027. As in *Pavia*, to date, no documents have been produced and no depositions have been taken.

**D. *Patterson v. NCAA*, No. 3:25-cv-00994 (M.D. Tenn., Campbell, J.)**

Unlike the previous cases, *Patterson* is a putative class action. The core merits claim in *Patterson* is the same as in *Zeigler*—the plaintiffs challenge the Five-Year Rule, arguing they

should have been allowed to play in five seasons of competition rather than four.

Until recently, the complaint in the case sought injunctive relief and damages on behalf of classes of student-athletes who exhausted their eligibility within four years of enrollment. Dkt. No. 35, No. 3:25-cv-00994 (M.D. Tenn. Nov. 10, 2025). Shortly after the complaint was filed, five of the named plaintiffs (Langston Patterson, Nicholas Levy, Nathanial Vakos, Kevin Gallic, and Lance Mason) filed a motion for preliminary injunction to allow them to compete in the 2026–27 football season. After a half-day evidentiary hearing, Judge Campbell denied the motion, once again finding that the plaintiffs had failed to show a likelihood of success on the merits. *Patterson v. NCAA*, No. 3:25-cv-00994, 2026 WL 115417, at *8 (M.D. Tenn. Jan. 15, 2026). Judge Campbell observed that the equities and public interest factors do not favor the plaintiffs, because "small changes in the eligibility rules have consequences that likely cannot be fully appreciated without further development of the record. The Court is mindful of its limitations in assessing the consequences of invalidating long-standing eligibility rules and Judge Thapar's admonition that judges 'should tread carefully in this area and insist on a thorough record from which to rule.'" *Id.* at *9 (quoting *Pavia*, 154 F.4th at 418 (Thapar, J., concurring)).

Discovery has commenced in the case and is currently slated to close in October 2026, with class certification proceedings to follow. To date, however, no documents have been produced, and no depositions have been taken. On July 15, 2026, plaintiffs sought leave to amend their complaint yet again. This time, plaintiffs' counsel added new plaintiffs and new allegations regarding the NCAA's adoption of the Age-Based Eligibility Rule in June 2026. Specifically, plaintiffs challenged the NCAA's decision not to apply the new rule retroactively to student-athletes who used their fourth season of competition in the 2025–26 season and thus exhausted their eligibility under the Five-Year Rule in effect throughout their college careers. Dkt. No. 112-

1, No. 3:25-cv-00994, at ¶ 3 (M.D. Tenn. July 15, 2026). Plaintiffs also added a variety of state breach-of-contract claims, *id.* at ¶ 13, and also sought to add five athletic conferences as co-defendants, *id.* at 1.

The putative Second Amended Complaint encompasses two classes. The first is the "Transition Exclusion Class," defined as "[a]ll NCAA Division I college athletes who first enrolled in college no later than the fall of 2022 who (i) did not take a redshirt year; (ii) received at least 50% of "full grant-in-aid," as defined by NCAA Bylaw 15.02.5; (iii) completed their fourth season of competition during the 2025–2026 academic year; and (iv) were excluded from participation in a fifth season of competition during the 2026–2027 academic year." *Id.* at ¶ 254. The second is the "Lost Opportunities Damages Class," defined as "[a]ll NCAA Division I college athletes who first enrolled in college no earlier than the fall of 2020 and no later than the spring of 2022, who (i) did not take a redshirt year; (ii) received at least a 50% of "full grant-in aid," which is defined by NCAA Bylaw 15.02.5; and (iii) whose eligibility was extinguished by application of the Four Seasons Rule (NCAA Bylaw 12.6) at the conclusion of the 2023–2024 season (for spring sports) or 2024–2025 season (for all sports)." *Id.* at ¶ 255. The NCAA opposed the motion for leave to amend, Dkt. No. 122; no decision has yet been issued on the motion.

**E. *Morton v. NCAA*, No 1:26-cv-01538 (N.D. Ga., Geraghty, J.)**

Morton is functionally identical to Pavia. Javier Morton competed in junior college for a year before completing three seasons of competition at NCAA member institutions. He sued in March 2026, claiming that the NCAA's decision to count his junior college season against his eligibility clock—and not grant him a fifth season of competition in 2026–27—violates the Sherman Act. Dkt. No. 2 at ¶¶ 6, 11, No. 1:26-cv-01538 (N.D. Ga. Mar. 27, 2026). Plaintiff did not serve the NCAA until months after the case was filed. The NCAA subsequently moved to dismiss; briefing on that motion is ongoing.

**F. *Wisne v. NCAA*, No. 1:26-cv-03063 (D. Colo., Sweeney, J.)**

*Wisne* is a putative class action filed in the District of Colorado raising antitrust claims that are materially identical to those in the Second Amended *Patterson* complaint. Specifically, plaintiffs challenge the NCAA's implementation of the Age-Based Eligibility Rule under Section 1 of the Sherman Act and a vague breach of contract theory. Dkt. No. 1 at ¶¶ 63–76, No. 1:26-cv-03063 (D. Colo. July 8, 2026). While differently worded, plaintiffs' putative class appears to be coextensive with the "Transition Exclusion Class" in *Patterson*; it is defined as "[a]ll persons in the United States who began to play in NCAA Division I sports in the 2022–2023 season and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule." *Id.* at ¶ 55. Plaintiffs seek both injunctive relief and damages. Plaintiffs filed a motion for a temporary restraining order and a related motion for injunctive class certification. The NCAA opposed both motions. No decision has yet been issued and the NCAA has not yet filed a responsive pleading.

**G. *Fuller v. NCAA*, No. 2:26-cv-01974 (D. Nev., Gordon, J.)**

On June 29, 2026, Cohen Fuller filed an individual antitrust and breach of contract action. Fuller competed in collegiate football for one season at an NAIA institution and one season at a junior college before competing at NCAA member institutions for two years. Dkt. No. 3 at ¶ 24, No. 2:26-cv-01974 (D. Nev. June 29, 2026). He claims that the NCAA's decision to count the NAIA and junior college seasons against his eligibility clock—and not grant him a fifth season of competition in 2026-27—violates the Sherman Act and also gives rise to two state law contract claims. *Id.* at ¶¶ 150–182. Fuller seeks both injunctive relief and damages.

Fuller filed a motion for preliminary injunction, which the NCAA opposed on July 24, 2026. Dkt. No. 22, No 2:26-cv-01974 (D. Nev. July 24, 2026). The NCAA argued, among other

things, that the case should be transferred to the Middle District of Tennessee under the first-to-file rule. *Id.* at 6–9. The court has not yet taken any action.

### H. *Wiley v. NCAA*, No. 2:26-cv-02281 (D. Nev., Silva, J.)

On July 27, 2026, La'Vario Wiley filed an individual antitrust action seeking injunctive relief allowing him to compete in Division I football for the 2026–27 season. Wiley originally enrolled at a junior college in 2019 for one season and then played three seasons of Division I football. Dkt. No. 1 at ¶¶ 21–26, No. 2:26-cv-02281 (D. Nev. July 27, 2026). Wiley claims that the NCAA's decision not to grant him a fifth season of competition (and sixth season of eligibility) violates the Sherman Act. Wiley has filed motions for a temporary restraining order and preliminary injunction. The NCAA intends to oppose both motions.

## III. LEGAL STANDARD

"When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). Transfer is proper where it would serve "the convenience of parties and witnesses" and "promote the just and efficient conduct of such actions." *Id.* Section 1407's purpose "is to eliminate the potential for conflicting contemporaneous pretrial rulings . . . in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491–92 (J.P.M.L. 1968). This is especially true "in the field of class action determinations in related multidistrict civil actions." *Id.* at 493. Centralization avoids the "pretrial chaos in conflicting class action determinations which Section 1407 was designed to make impossible." *Id.* at 492–93.

## IV. ARGUMENT

### A. Transfer of the College Athlete Eligibility Cases for Coordination Is Appropriate Under 28 U.S.C. § 1407.

#### 1. These Actions Involve Numerous Common Questions of Fact.

The College Athlete Eligibility Cases share multiple common questions of fact and law:

1. The NCAA's rulemaking history and deliberations, including the process leading to the adoption of the Division I eligibility rules;
2. Whether the NCAA's current and former eligibility rules constitute "commercial" restraints subject to antitrust scrutiny under the Sherman Act, or are instead "non-commercial" restraints outside the purview of the statute;
3. How the eligibility rules affect student-athletes;
4. The proper definitions of the relevant product and geographic markets;
5. The economic impact of the NCAA's eligibility rules;
6. Whether the NCAA's eligibility rules have anticompetitive effects based on the current market realities of college sports;
7. The NCAA's procompetitive justifications for the eligibility rules;
8. Whether there are substantially less restrictive alternatives to the NCAA's eligibility rules;
9. Whether plaintiffs suffered antitrust injury;
10. The appropriate measure of damages, if any, sustained by the plaintiffs;
11. For *Patterson* and *Wisne*, whether class action treatment is appropriate; and
12. For *Patterson* (if leave to amend is granted), *Wisne*, and *Fuller*, whether the NCAA Manual is a contract enforceable by student-athletes; whether breach of contract claims are cognizable against a voluntary membership association, and whether any breach has occurred.

These common issues are more than sufficient for the Panel to order the transfer and coordination of these actions in a single judicial district.

*Patterson* and *Wisne*, standing alone, are similar to the cases that this Panel ordered centralized in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust*

*Litig.*, 24 F. Supp. 3d 1366, 1367 (J.P.M.L. 2014) ("*Grant-in-Aid*"). There, the Panel centralized two putative class actions that both involved "antitrust challenges to the [NCAA's] bylaws that limit athletic grants-in-aid." *Id.* at 1366. The Panel found that the actions were appropriate for centralization because: (1) "both actions attack the NCAA's bylaws limiting the amount of athletic grants-in-aid for student-athletes," (2) both "assert similar claims that the NCAA's bylaws regarding the amount of athletic grants-in-aid violate Section 1 of the Sherman Act," and (3) "both actions will involve similar defenses regarding the protection of amateurism in college sports and the promotion of competitive balance." *Id.* at 1367. The same is true for *Patterson* and *Wisne*, except that the plaintiffs are attacking eligibility rules rather than compensation rules.

The NCAA acknowledges that the Panel later declined to centralize two overlapping antitrust class actions in *In re College Athlete Compensation Antitrust Litigation* (MDL 3105). But here, the case for centralization for coordinated proceedings is not limited to just *Patterson* and *Wisne*. There are multiple other individual actions involving the exact same factual issues, with more expected to come. At least one individual plaintiff (*Zeigler*) is a member of one of the classes (*Patterson*). Absent centralization, a multitude of courts will have to confront the common issues across these cases—including as to the same individual plaintiff—and the NCAA will have to litigate the cases in many different forums and risk conflicting rulings.

Indeed, "[t]he Panel frequently centralizes dockets comprising both class actions and individual cases." *In re Juul Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 396 F. Supp. 3d 1366, 1367 (J.P.M.L. 2019). That is in recognition of the efficiencies of centralizing class and individual actions, where, as here, "'liability discovery in all the cases will certainly overlap.'" *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*, 363 F. Supp. 3d 1378, 1382 (J.P.M.L. 2019) (quoting *In re: Toyota Motor Corp. Unintended Acceleration*

*Mktg., Sales Practices, Prod. Liab. Litig.*, 704 F. Supp. 2d 1379, 1381–82 (J.P.M.L. 2010)); *see also*, *e.g.*, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391 (J.P.M.L. 2018); *In re Johnson & Johnson Talcum Powder Mktg., Sales Practices, & Prods. Liab. Litig.*, 220 F. Supp. 3d 1356, 1357 (J.P.M.L. 2016) (centralizing nine personal injury actions and two consumer class actions involving common "factual questions"). If there are issues unique to the individual cases, the transferee judge "can use separate tracks or other appropriate pretrial techniques to accommodate any differences among the actions." *Juul Labs*, 396 F. Supp. 3d at 1367–68.

**2. The Geographic Dispersal of Existing Cases and the High Likelihood of Additional Tag-Along Actions Weighs In Favor of Centralization.**

The flurry of recent lawsuits over eligibility rules demonstrates the need for centralization. In the last few months, multiple new federal antitrust eligibility actions have been filed—*Fuller* in June 2026; *Wisne* and *Wiley* in July 2026. The *Patterson* plaintiffs likewise sought to amend their complaint in the same timeframe. These new filings, together with the pre-existing actions, mean that the common issues presented by the Eligibility Cases are now live in five different federal districts. There is also a high likelihood of future copycat actions, given that the factual scenarios giving rise to the existing lawsuits are likely to recur. All of these points further justify the creation of an MDL. *See, e.g., In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 655 F. Supp. 3d 1380, 1382 (J.P.M.L. 2023) (the potential for additional tag-along actions and the infeasibility of future § 1404 transfer motions tips the balance in favor of centralization).

**3. Centralization Will Eliminate Duplicative Discovery.**

Absent centralization, the eight actions will require duplicative discovery, on parallel tracks in five separate courts, into the NCAA's rulemaking history and the common antitrust and contract issues raised by the plaintiffs. The NCAA—the sole defendant in all these actions—would be

required to produce substantially identical documents, respond to substantially identical written discovery, and make the same institutional witnesses available for deposition multiple times in multiple forums. The Panel has consistently recognized that centralization of antitrust litigation against a single defendant is appropriate to avoid exactly this kind of duplication. *See In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 412 F. Supp. 3d 1344, 1346 (J.P.M.L. 2019); *In re Diisocyanates Antitrust Litig.*, 341 F. Supp. 3d 1376, 1377–78 (J.P.M.L. 2018). Indeed, the Panel has previously recognized that antitrust litigation against this very defendant is not well-suited to informal coordination and instead warrants centralization. *Grant-in-Aid*, 24 F. Supp. 3d at 1367–68.

Centralization will ensure that the NCAA's witnesses are not subject to duplicative discovery demands across multiple courts and will also minimize duplication of expert discovery on overlapping issues such as market definition, antitrust liability, and damages. *See In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d 1361, 1363 (J.P.M.L. 2014) (centralization ensures common witnesses are not subjected to duplicative discovery demands); *In re Hair Relaxer Mktg., Sales Pracs., & Prods. Liab. Litig.*, 655 F. Supp. 3d 1374, 1376 (J.P.M.L. 2023) (centralization minimizes duplication of expert discovery); *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 949 F. Supp. 2d 1368, 1369 (J.P.M.L. 2013) (centralization "eliminate[s] duplicative discovery; prevent[s] inconsistent pretrial rulings, including with respect to class certification; and conserve[s] the resources of the parties, their counsel, and the judiciary"); *In re Hyundai & Kia Fuel Economy Litig.*, 923 F. Supp. 2d 1364, 1365 (J.P.M.L. 2013) (centralization eliminates duplicative discovery on a common issue of fact).

*Boyd*, *Pavia*, and *Patterson* are already coordinating discovery in the Middle District of Tennessee, reflecting the commonality of issues across cases with slightly factual scenarios

(whether NAIA seasons should count under the Five-Year Rule, whether junior college seasons should count under the Five-Year Rule, and whether student-athletes were permissibly limited to four seasons of competition, respectively). But discovery is still in its early stages. Formal centralization would extend the coordination already underway in these cases to *Fuller*, *Morton*, *Wiley*, *Wisney*, and *Zeigler*, and would avoid duplicative production of NCAA rulemaking documents and duplicative depositions and discovery in different courts.

### 4. Centralization Will Avoid Inconsistent Pretrial Rulings, Including With Respect to Overlapping Putative Classes.

The Panel has repeatedly concluded that "the potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district" for coordinated pretrial proceedings. *In re Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L. 1970). Transfer is appropriate, "if not necessary," whenever the possibility of inconsistent class determinations exists. *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975).

Having a single judge oversee class action issues avoids duplicative efforts where multiple actions implicate the same class. *In re First Nat'l Bank, Heavener, Okla. (First Mortg. Revenue Bonds) Secs. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978); *see also In re Republic Nat'l-Realty Equities Secs. Litig.*, 382 F. Supp. 1403, 1405 (J.P.M.L. 1974). It also avoids the possibility of "overlapping class determinations," or perhaps even conflicting class determinations, as to the same group. *In re Nat'l Airlines, Inc. Maternity Leave Pracs. & Flight Attendant Weight Program Litig.*, 399 F. Supp. 1405, 1407 (J.P.M.L. 1975); *see also In re Tremont Grp. Holdings, Inc., Secs. Litig.*, 626 F. Supp. 2d 1338, 1340 (J.P.M.L. 2009); *In re Holiday Magic Secs. & Antitrust Litig.*, 375 F. Supp. 1400, 1402 (J.P.M.L. 1974).

Under this line of authority, centralization would be appropriate based on *Patterson* and

*Wisne* alone. *Patterson*'s putative Transition Exclusion Class covers student-athletes who enrolled in college no later than fall 2022 and completed four seasons of competition by the 2025–26 academic year. That class is coextensive with the putative *Wisne* class, which covers student-athletes who began play in the 2022–23 season and completed four years of eligibility by the 2025–26 academic year. And there is meaningful overlap between the claims of those putative classes and *Patterson*'s putative Lost Opportunities Damages Class, which involves similar claims from a different time period. Absent centralization, the Middle District of Tennessee (presiding over *Patterson*) and the District of Colorado (presiding over *Wisne*) would independently adjudicate class certification, class definition, and damages-measurement questions for what may be an overlapping, if not identical, set of individual class members. That raises the possibilities of inconsistent class determinations and potential double recovery or conflicting judgments—the dangers that Section 1407 is designed to prevent. *In re Plumbing Fixtures*, 308 F. Supp. at 244.

But the concerns about inconsistent rulings extend beyond class certification, and beyond *Wisne* and *Patterson*, to countless issues in all the Eligibility Cases, including discovery, privilege, and *Daubert* motion practice generally. *See In re Pork Direct & Indirect Purchaser Antitrust Litig.*, 544 F. Supp. 3d 1379, 1380 (J.P.M.L. 2021); *In re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016). Section 1407's purpose is to eliminate the potential for conflicting, contemporaneous pretrial rulings wherever they may occur. *See In re First Nat'l Bank, Heavener, Okla. Secs. Litig.*, 451 F. Supp. at 997 (transfer "necessary . . . to prevent duplicative pretrial proceedings and eliminate the possibility of inconsistent pretrial rulings" where actions "arise from the same factual situation and share numerous complex questions of fact"); *In re Republic Nat'l-Realty Equities Secs. Litig.*, 382 F. Supp. at 1405 (transfer avoids duplication of common discovery and "eliminate[s] the possibility of conflicting Rule 23 class determinations and other pretrial

rulings”). Because the core merits issues are similar across all of the Eligibility Cases, it is essential to have one court address the common pretrial issues that will arise.

**5. Centralization Will Conserve Party, Counsel, and Judicial Resources.**

Transfer will also reduce litigation costs and conserve judicial resources by eliminating the need for the NCAA (and, to some degree, plaintiffs’ counsel) to make multiple, duplicative court appearances and to brief the same recurring issues in eight cases across five districts. “Conserv[ing] the resources of the parties” is a routine consideration underlying the Panel’s centralization decisions, including in prior NCAA antitrust litigation. *See Grant-in-Aid*, 24 F. Supp. 3d at 1367; *see also In re Royal Alliance Assoc., Inc., Secs. Litig.*, 856 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012); *In re: Aon Corp. Wage & Hour Emp. Pracs. Litig.*, 581 F. Supp. 2d 1376, 1376 (J.P.M.L. 2008). There are “significant efficiencies to be gained, for both the parties and the judicial system, by having only one court oversee discovery.” *In re Taasera Licensing, LLC, Patent Litig.*, 619 F. Supp. 3d 1352, 1353 (J.P.M.L. 2022). Just so here: The parties or the courts should not duplicate the same work again and again.

As noted above, the fact that *Boyd*, *Pavia*, and *Patterson* are already informally coordinating discovery in the Middle District of Tennessee demonstrates both the feasibility and the benefits of coordinated pretrial proceedings across the Eligibility Cases. Transfer under Section 1407 would formalize and extend that coordination to other cases and would not result in duplicative work given that discovery is still in its early stages in the Middle District of Tennessee.

The overlapping trial schedule among the coordinated Tennessee actions (the *Pavia* and *Zeigler* trials are set for February 2027, and *Boyd* is set for March 2027) further supports transfer. Centralization would permit the transferee court to establish a unified pretrial schedule that avoids conflicting deadlines, coordinates expert discovery across all eight actions, and resolves common pretrial motions in a single, consistent framework.

#### 6. The Differing Procedural Postures of the Cases Supports, Rather Than Undermines, the Case for Centralization.

The Eligibility Cases are at meaningfully different procedural stages. *Wisne*, *Fuller*, and *Wiley* are at the pleadings stage with preliminary injunction motions pending. *Zeigler* is still at the pleadings stage after the denial of a preliminary injunction, with trial set for February 23, 2027. *Morton* is still at the pleadings stage with no preliminary injunction motion having been filed. *Boyd* and *Pavia* have trial dates set for early 2027. *Boyd*'s preliminary injunction motion has already been denied, and *Pavia*'s docket reflects a mixed preliminary-injunction history: The original plaintiff's motion was granted in December 2024, a subsequently consolidated plaintiff's motion was denied, and another motion remains pending. *Patterson*'s trial date is farther away, but the case is already coordinated for discovery with the other Middle District of Tennessee cases.

This variation in procedural posture supports, rather than undermines, the case for centralization. The Panel has repeatedly centralized cases that "are at disparate procedural postures," including cases in which discovery is closed, so long as "more advanced actions are likely to benefit from centralization, even if there could be some immediate delay." *In re Future Motion, Inc. Prods. Liab. Litig.*, 709 F.Supp.3d 1394, 1395–96 (J.P.M.L. 2023). Centralization helps "eliminate inconsistent rulings on evidentiary and dispositive motions," and "with respect to the actions in which discovery remains, centralization will allow for coordination and elimination of duplicative discovery and motion practice." *Id.*

Further, established procedures permit discovery already completed in a more advanced action to be made available to all parties in the other actions. *In re S. Central States Bakery Prods. Antitrust Litig.*, 433 F. Supp. 1127, 1130 (J.P.M.L. 1977). The Panel has accordingly centralized cases after execution of a memorandum of understanding to settle, *In re Enfamil Lipil Mktg. & Sales Pracs. Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011); after the filing of a summary

judgment motion, *In re Cap. One Bank Credit Card Int. Rate Hike Litig.*, 716 F. Supp. 2d 1372, 1373 (J.P.M.L. 2010); and even after class certification, notice, and substantial discovery had already occurred, *In re LTV Corp. Secs. Litig.*, 470 F. Supp. 859, 861 (J.P.M.L. 1979). Here, the case for centralization is even clearer: The cases that are farthest along (*Boyd*, *Pavia*, and *Patterson*), are still not that far along in terms of discovery.

**7. Transfer Pursuant to 28 U.S.C. § 1404 Is Not Adequate.**

Finally, there is no "reasonable prospect that . . . Section 1404 motions will resolve the difficulties posed by duplicative multidistrict litigation." *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 619 F. Supp. 3d 1349, 1350 (J.PM.L. 2022) ("The mere pendency of [Section 1404] motions, though, is not necessarily sufficient to defeat centralization. . . ."). None of the factors that the Panel examines—including "the amenability of counsel to Section 1404 transfer, orders addressing transfer in the underlying actions, and the likelihood of potential tag-along actions," *id.* at 1350–51—suggests that § 1404 would be an adequate alternative.

First, plaintiffs' counsel have not suggested they are amenable to transfer from their chosen venues. See *In re Air Crash Into Java Sea on Jan. 9, 2021*, 669 F. Supp. 3d 1368, 1371 (J.P.M.L. 2023) (noting that "none of the plaintiffs has expressed a willingness to litigate outside their chosen forum"). The NCAA requested transfer in Fuller, but plaintiffs' counsel has not consented. That the Fuller, Morton, Wiley, and Wisne plaintiffs chose to file outside Tennessee even after multiple cases were already pending there makes it all the less likely that they would consent to transfer. Under these circumstances, the NCAA would have to file and prevail on a welter of contested transfer motions in order to achieve centralization.

Second, there is a high likelihood of potential tag-along actions. *See supra* at 11–12; see also *In re Crop Prot. Prods*. Loyalty Program Antitrust Litig., 655 F. Supp. 3d 1380, 1382 (J.P.M.L. 2023) ("[T]his potential for more tag-along actions and the uncertainty of the result and

timing of rulings on any future Section 1404 transfer motions . . . tip[s] the balance in favor of centralizing this complex antitrust litigation."). When the Panel first received a Motion for Transfer in the Grant-in-Aid MDL, only two cases were pending, but more potential tag-along actions soon followed. *Grant-in-Aid*, 24 F. Supp. 3d 1366. It is likely the same will occur here, given that three Eligibility Cases have been filed in just the last two months.

In short, the outcome of any potential § 1404 motion to transfer "remains too uncertain for [the Panel] to conclude that [such a motion] offer[s] a reasonable prospect of eliminating the multidistrict character of this litigation." *In re Taasera Licensing*, 619 F. Supp. 3d at 1353. These obstacles will only multiply if and when additional potential tag-along actions are filed. The Panel should therefore centralize these actions for coordinated proceedings and transfer under § 1407.

**B. The Middle District of Tennessee Is the Proper District for Centralization**

The Panel should centralize the Eligibility Cases before Chief Judge Campbell, in the Middle District of Tennessee, for five independent reasons.

*First*, that district has more pending eligibility cases than any other district—*Boyd*, *Patterson*, and *Pavia*. The Panel has regularly selected the district with the greatest number of related actions already pending as the transferee district. *See In re Nat'l Arb. Forum Antitrust Litig.*, 682 F. Supp. 2d 1343, 1345–46 (J.P.M.L. 2010) (selecting transferee district in part because a majority of the pending actions were already located there)

*Second*, discovery coordination is already in place in the Middle District of Tennessee, providing a ready-made framework for extending coordination to the remaining actions. Transfer will extend efficiencies already underway rather than requiring any court to start from scratch.

*Third*, Chief Judge Campbell has developed substantial familiarity with the issues in the case by presiding over preliminary injunction motions in *Boyd*, *Patterson*, and *Pavia*. He has given extensive consideration to the antitrust issues presented and has already had one of his decisions

go up on appeal. He is familiar with the NCAA's eligibility framework, the facts underlying the NCAA's rules, several of the experts that have already been proffered in these cases, and the majority of counsel involved. This judicial familiarity—built through extensive briefing and evidentiary hearings—represents a significant investment that would be lost if the Panel were to select a different transferee district.

*Fourth*, the Middle District of Tennessee is an appropriate forum for an MDL. The District already has one MDL pending—*In re RealPage, Inc. Rental Software Antitrust Litigation* (MDL No. 3071). The District has no judicial vacancies, and the median time to disposition of civil cases is 9 months.[2]

*Fifth*, Nashville is centrally located and readily accessible. The NCAA is headquartered in Indianapolis, Indiana, and its counsel are based in Nashville and Washington, D.C. Nashville is convenient for parties and witnesses in the Tennessee-based actions and is accessible by direct flights from Atlanta (where *Morton* is pending), Denver (where *Wisne* is pending), and Las Vegas (where *Fuller* is pending).[3]

## V. CONCLUSION

For the foregoing reasons, the NCAA respectfully requests that the Panel enter an order transferring and centralizing the eight above-captioned actions for coordinated pretrial proceedings before Chief Judge Campbell of the United States District Court for the Middle District of Tennessee, Nashville Division, pursuant to 28 U.S.C. § 1407.

---

[2] Table C-5—U.S. District Courts–Civil Statistical Tables For The Federal Judiciary (December 31, 2025), U.S. Courts, https://www.uscourts.gov/data-news/data-tables/2025/12/31/statistical-tables-federal-judiciary/c-5.

[3] *Nonstop Destinations*, Nashville International Airport, https://flynashville.com/flights/nonstop-destinations [https://perma.cc/BL46-M8NR].

Dated: July 31, 2026

Respectfully submitted,

/s/ *Rakesh N. Kilaru*
Rakesh Kilaru
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com

/s/ *Taylor J. Askew*
Taylor J. Askew
David J. Zeitlin
HOLLAND & KNIGHT LLP
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
taylor.askew@hklaw.com
david.zeitlin@hklaw.com

*Attorneys for Defendant National Collegiate Athletic Association*